OPINION
NIEMEYER, Circuit Judge.
In this case, we decide whether, under the principles of NLRB v. Gissel, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the National Labor Relations Board properly ordered a company to bargain with a union that did not win its representation election.
In the fall of 1994, the International Brotherhood of Teamsters, AFL-CIO, and its affiliated locals (“Teamsters”) began a nationwide campaign to organize the employees of Overnite Transportation Company, headquartered in Richmond, Virginia. At that time, Overnite was one of the nation’s largest non-union trucking companies, with approximately 175 service centers across the country and approximately 14,000 employees.
In its campaign, the Teamsters promised Overnite employees that union representation would bring a new golden age, when the employees would have the benefit of the National Master Freight Agreement and would receive wage increases of more than $2.50 per hour, larger pensions, less expensive and more comprehensive medical benefits, and more favorable work rules. While Overnite observed that such a pay package would cost an amount that exceeded the sum of its profits, it nevertheless sought to portray a bright future without union representation under the leadership of its new president, Jim Douglas. Perhaps to provide a glimpse of that bright future, Overnite announced, during the heated campaign, a national pay increase.
The Teamsters’ efforts led to elections at numerous Overnite service centers in 1995. In connection with those elections, the Teamsters filed complaints of unfair labor practices against Overnite, and, at 17 locations where the union lost, rather than seek new elections, the Teamsters sought orders directing Overnite to bargain with the union, based on NLRB v. Gissel.
The numerous proceedings before the National Labor Relations Board (“Board”) were consolidated into one massive proceeding. Some elections were certified, and issues relating to others were settled. The parties agreed, however, to litigate the complaints at four locations where Gis-sel bargaining orders were sought— Bridgeton, Missouri; Norfolk, Virginia; Louisville, Kentucky; and Lawrenceville, Georgia. Ultimately, the Board found widespread unfair labor practices at these *422 four locations, as well as nationwide unfair labor practices stemming from Overnite’s pay increases in March 1995 and January 1996. The Board further found that, at these four locations, the ability to hold new elections that were fair “would be unlikely” and that the employees’ wishes at these locations were “better gauged by ... old card majorities] than by ... new election[s].” The Board therefore chose not to order new elections, opting instead to enter Gissel orders directing Overnite to bargain with the Teamsters.
On Overnite’s petition for review and the Board’s cross-application for enforcement, we conclude that most of the Board’s findings of unfair labor practices were supported by substantial evidence, but some were not. We also conclude that the Board’s decision to issue Gissel orders was not supported by evidence sufficient to justify that extraordinary relief. By declining to follow our long-standing precedents for the application of Gissel, the Board improperly bypassed the employees’ will on the question of representation, frustrating the fundamental policy of employee democracy established by Congress in the labor laws. Accordingly, we grant in part and deny in part Overnite’s petition for review; we deny the Board’s cross-application for enforcement insofar as its order is inconsistent with this opinion; and we remand this case for new elections at the four service centers.
I
Before the Teamsters’ organizing effort that commenced in late 1994, Overnite was a non-union trucking company. Over the years, since at least 1980, it had followed the practice of granting its employees annual pay raises which took the form of either direct increases in hourly wages or increases in base mileage rates. The raises varied in character and in amount, depending upon Overnite’s financial performance during the relevant period.
Until 1991, a raise was granted every October. In 1991, however, poor performance forced Overnite to defer the raise until January 1992. Even then, only a small wage increase was granted. Again in 1992, Overnite deferred the annual raise to January 1993. By the end of 1993, continuing financial weakness forced Over-nite to alter the form of its raise altogether. In addition to continuing its trend of deferring raises until January, Overnite changed the form of its raise in 1994 to a Performance Incentive Plan. Under the Plan, employees were to earn additional compensation after specified quarterly earnings targets were reached. In practice, however, the company met the targets only once, leading to only one Performance Incentive Plan payment. It was, perhaps, in response to Overnite’s vulnerability from employee dissatisfaction with the Performance Incentive Plan that, in September 1994, the Teamsters began a campaign to organize Overnite’s employees.
Overnite president Thomas Boswell responded to the organizing effort with a letter to employees, dated November 22, 1994, in which he criticized the Teamsters, warning that the union did not have the employees’ interests in mind. He stated that the Teamsters cared only about obtaining income through union dues and the employees’ pension fund, and he suggested that the union often caused strikes, harming both the employer and the employees. Boswell asserted that unionized companies “have often lost the battle to survive,” pointing out that, over the last 30 years, the 50 top trucking companies had dwindled to 8 and that almost all had dealt with employees through the Teamsters.
In addition to criticizing the Teamsters, Boswell acknowledged, in December 1994, that the Performance Incentive Plan had *423 been a failure. To cure this failure, he announced yet another version of the annual raise. Hourly employees would receive a 50 cents per hour raise in January 1995, along with other “improvements,” such as compensation for time lost during breakdowns or weather delays. Nevertheless, by the end of 1994, two service centers — at Kansas City, Kansas, and Indianapolis, Indiana — had elected union representation and were certified.
Overnite responded to the 1994 employee dissension by making Jim Douglas its new president in January 1995. As promised in Boswell’s December announcement, Overnite awarded the 50-cent wage increase that month. Nevertheless, the Teamsters’ momentum continued as, during February, the union was elected and certified as the employees’ bargaining representative at two more service centers— at Blaine, Minnesota, and Sacramento, California — bringing the Teamsters’ representation to a total of four sites. By then, elections were also scheduled at 22 other service centers for February and March, and application petitions had been filed at 5 more.[1]
Possibly in response to the union’s successes, Douglas sent employees a letter in February 1995 announcing a second 1995 wage increase of 55 cents per hour, plus an increase in the mileage rate and a $250 safety bonus, all of which were to take effect in March. In the letter, Douglas acknowledged that Overnite’s pay had fallen behind that of some competitors. Although the letter was sent to all employees, including those represented by the union at the four certified service centers, Overrate stated that it was “prohibited from unilaterally implementing this discretionary increase for [represented] employees.” Overnite also trumpeted this March 1995 wage increase in a new newsletter, The Ovemiter, announcing in large, bold type, “hourly wage increases across the board.” The newsletter stated in smaller bold type that “Kansas City, Indianapolis, West Sacramento and Blaine employees who voted for Teamsters [were] not eligible.”
In addition to the March 1995 wage increase, Douglas undertook a more concerted campaign against the Teamsters on two fronts. First, he sought to motivate Overnite’s management to engage in the fight against the Teamsters, making numerous statements in letters and speeches to the effect that the Teamsters were a threat to the company and that working conditions would be better if Overnite remained union-free. In a letter sent to Overnite’s service center managers, he stated that the union’s campaign was “the biggest war of our lives” and that, to win, management had to “sound the bugle call and unleash the fury of the Overnite machine.” He urged Overnite to “muster [its] troops to all out attack.”
The second front targeted Overnite’s employees directly. Through Douglas’s leadership, Overnite started a campaign *424 called “Give Jim a Chance,” distributed T-shirts and buttons, and promised greater responsiveness to employee concerns. Douglas personally visited many service centers to inquire about employee concerns, asserting that his approach would be much different from that of former-president Boswell and that he would take care of the employees. Douglas also sent out a “quality team” of “troubleshooters” to Overnite’s service centers, whose mission was to discover the causes of employee unrest and to assess who favored the Teamsters and who did not. Acting as company ombudsmen, the troubleshooters promised to take employee grievances back to Overnite’s headquarters and to resolve them.
While assuring employees that it could meet their needs, Overnite was candid about its opinion of unions. Overnite’s employee hand-book stressed “that this Company values union-free working conditions.” Overnite also widely publicized the 13-year bargaining stalemate at its Chicago service center, where the Teamsters represented the employees. Even though a union had been certified in Chicago as early as 1982, Overnite pointed out that bargaining there had attained few favorable results for the employees. The union had conducted a strike there but still had no contract with Overnite.
In addition to its nationwide efforts, Ov-ernite countered the union organizing effort with its own carrot-and-stiek campaign at individual service centers, including the four at issue in this case — Bridgeton, Norfolk, Louisville, and Lawrenceville. The Board found many of Overnite’s actions in furtherance of its campaign to be unfair labor practices.
In Bridgeton, pro-union literature was removed from the break room, the bulletin board, and the employee bathroom, while anti-union literature was left alone. Supervisors followed pro-union employees and interfered with their conversations with other employees. To complement the anti-union sentiment, Overnite sent “troubleshooters” to ride with the drivers, soliciting grievances from them. The service center manager also told the employees that Overnite was looking into overtime and, while he could not make promises, he was “pretty sure” it would happen; it was “almost a done deal.” Douglas visited Bridgeton several times to discuss overtime pay with the employees. He told the employees that the company would take care of its own and that it did not need third party interference. The election was held on February 28, 1995, and the union lost by a vote of 24 to 22.
In Norfolk, where employees had been permitted to post anything on bulletin boards, pro-union literature was destroyed and an employee who posted such literature was told by a manager that “people could get fired for this.” Supervisors broke up conversations, and a manager warned employees that their relationships with their supervisors would change for the worse if the union were elected. Two pro-union employees were called “agitators” by their manager, and the manager added that he did not want anything bad to happen to them and that they should be careful. He implied that, if the union lost the election, they could be fired for their pro-union stance. The head service center manager made predictions about the consequences of unionization. He noted that union employees at Kansas City had not received the March 1995 wage increase, and he warned that the Norfolk bargaining experience would result in a stalemate like the one in Chicago. Another supervisor indicated that the then-pending March wage increase would be lost if the union was elected. The election was held on *425 March 31, 1995, and the union lost by a vote of 58 to 29.
In Louisville, Overnite’s central management urged employees to give Jim Douglas a chance. An Overnite Vice President visited Louisville in November 1994 and asked employees if there were complaints with which he could help them. When told that the employees wanted overtime pay, he said that, while he could not promise to pay time-and-a-half, “possibly, in the future, things might get better.” In March 1995, about a week before the election, Douglas visited Louisville, again promising improvements. He used the March 1995 wage increase as an example of his positive changes. On the negative side of the carrot-and-stick campaign, Douglas warned employees that the Teamsters would likely try to block the March 1995 pay raise. Other Overnite management warned that, if elected, the Teamsters would ruin Over-nite. Dispatchers told two employees that, if Overnite went union, it would close its doors, leaving all the employees out of work. An Overnite vice president told the employees that company representatives simply showed up for negotiations in Chicago, explaining that even if charges were filed for bargaining in bad faith, the company would be required only to pay a small fine. It would then not have to return to the negotiating table until the following year. He suggested that the only way to get a union contract would be to go on strike, and employees who took that course could be replaced. The “Wheel of Misfortune,” a circular passed out during a discussion of strikes, showed employees what they could lose by going on strike. A supervisor warned that, if the union was elected, he would enforce company rules more stringently, writing employees up for every arguable violation. A supervisor also warned that Overnite would “play hardball” if the union won the election. As election day approached, supervisors removed pro-union materials from the break room, leaving anti-union materials. One supervisor told an employee that the union pin he was wearing could be hazardous to his health. Another supervisor told an employee that, since the union campaign had started, he had an “attitude problem.” A supervisor prohibited union adherents from talking with other employees. The Louisville election was held on March 17, 1995, and the union lost by a vote of 85 to 83.
In Lawrenceville, employees were also prevented from posting pro-union materials on employee bulletin boards in the break room. At mandatory meetings, employees were told that Overnite would go out of business if the Teamsters were elected, and employees who supported the union were advised to seek employment at a union company. Managers and an Over-nite vice president reminded the employees of the troubled Chicago bargaining experience, warning that, even if the union won the election, Overnite would take an adversarial bargaining position with every incentive to meet only the bare requirements of good-faith bargaining. One dispatcher cautioned that the company would never sign a union contract. A manager warned that he would revert to previously ignored infractions if he needed to get rid of people. Again, the warnings were supplemented with the message that existing management would adequately meet the employees’ needs. The service center manager encouraged .employees to give Jim Douglas a chance. He suggested that improvements in the company were imminent, but that they would be available only if employees voted against the union. On separate occasions, a dispatcher and a vice president noted that the Kansas City service center, which had voted for the Teamsters, did not get the March 1995 pay raise and that the raise would have to be negoti *426 ated with the union. Shortly before the scheduled election, Douglas visited Law-renceville and asked one employee whether he was willing to sacrifice 14,000 jobs for “this campaign.” The election was held on April 17, 1995, and the union lost by a vote of 42 to 38.
Based on these incidents, the Teamsters filed numerous unfair labor practice complaints, and at 17 service centers where it lost elections, it sought orders from the NLRB directing Overnite to bargain with the Union without having new elections. The Board’s General Counsel issued a consolidated complaint alleging that Overnite violated § 8(a)(1) and (3) of the National Labor Relations Act (the “Act”), 29 U.S.C. § 158(a)(1) and (3). As characterized by the administrative law judge (“ALJ”) and by the Board, the proceedings were “massive,” involving numerous allegations of unfair labor practices at distinct locations as well as alleged nationwide unfair labor practice in implementing the March 1995 wage increase.
In July 1995, the General Counsel and Overnite settled almost all of the § 8(a)(1) unfair labor practice complaints and those § 8(a)(3) unfair labor practice complaints for which the only remedy required was a cease-and-desist order and the posting of notice. They also settled certain § 8(a)(3) complaints relating to the national wage package at specified locations where the Teamsters had already been certified as representing the employees. The settlement left for resolution the so-called “national” allegations and other allegations that, in the General Counsel’s view, supported Gissel bargaining orders. In considering the Gissel orders, the General Counsel specifically reserved the right to use evidence pertaining to allegations that had previously been settled. Thus, following the July 1995 settlement, the parties agreed to litigate the Gissel complaints with respect to the four service centers at Bridgeton, Norfolk, Louisville, and Law-renceville.
By the end of 1995, the Teamsters represented the employees at eight of Over-nite’s service centers, and the union had been elected to represent the employees at six other centers where it was awaiting certification. The Teamsters locals had also entered into coordinated bargaining with Overnite through a Teamsters national committee founded for that purpose.
Meanwhile, during 1995, Overnite continued its annual practice of assessing its financial performance for the purpose of setting the terms of its annual wage increase. Because another year of financial losses made a wage increase appear impossible, Overnite retained a consultant to study its operations and to recommend productivity improvements. The consultant proposed numerous changes which it predicted would result in annual savings to Overnite of approximately $65 million. To make possible a wage increase for 1996 of between 40 cents and 60 cents per hour, Overnite decided to link the raise to the consultant’s recommended productivity changes.
On December 7, 1995, Overnite conducted satellite conferences with all of its service center managers and provided them with an extensive guide to use in presenting the productivity changes to employees. Overnite then notified its unrepresented employees of the changes on December 11, 1995, presenting the changes through a videotape of Douglas and supporting documents. On that day, the information was also sent, via overnight mail, to the union representatives of Overnite’s certified service centers and to the representatives of service centers still awaiting certification. Overnite offered the Teamsters the same package that was granted to non-union employees. On December 13, several days *427 before the negotiations with union representatives were scheduled to begin, Over-nite held a meeting where it explained the proposed terms of the 1996 wage increase to represented employees and to employees at the service centers awaiting certification.
Overnite’s plan was to link the 1996 wage increase to performance, as it had done in previous years. Thus, in exchange for a wage increase, Overnite sought to implement productivity improvements by retaining the right, among other things, to set work days, hours, and routes; to assign work and equipment; to separate employees involuntarily; to contract for casual or temporary personnel; and to divert freight to alternative modes and carriers. The Teamsters, however, took the position that the “wage increase [was] an established past practice of Overnite, and that, as [Overnite was] obligated to maintain the status quo pending a collective-bargaining agreement, the wage increase must be extended to [represented employees].” Because the Teamsters refused to negotiate the productivity changes, except as part of an overall contract, Overnite eventually declared an impasse in negotiations. It announced its intention to implement the productivity agreement unilaterally at the six units awaiting certification, effective August 4,1996.
The union filed another unfair labor practice complaint, alleging that, by explaining the productivity changes to the employees in the represented centers without first adequately negotiating with the Teamsters, Overnite bypassed the union and engaged in direct dealing. The union also alleged that Overnite unilaterally changed the represented employees’ terms of employment by failing to give them the wage and benefit improvements and by implementing the terms of the productivity changes at the six units where the Teamsters had been elected but not yet recognized. This complaint was added to the consolidated proceedings that were in progress.
The Board, substantially affirming the ALJ’s lengthy findings, concluded that Ov-ernite “had committed unfair labor practices affecting employees on a nationwide basis and that the issuance of Gissel bargaining orders was warranted.” Overnite Transp. Co., 329 N.L.R.B. 1 (Nov. 10, 1999). Finding that the conduct fell within a Category II type of order, as identified by the Supreme Court’s opinion in Gissel, the Board explained:
[Overnite’s] course of misconduct both before and after the elections, clearly demonstrates that the holding of fair elections in the future would be unlikely and that the “employees’ wishes are better gauged by [ ] old card majorities] than by ... new electionfs].”
Id. at 2 (quoting Charlotte Amphitheater Corp. v. NLRB, 82 F.3d 1074, 1078 (D.C.Cir.1996) (modifications in the original)). The Board relied not only upon evidence relating to unfair labor practices alleged to have occurred before the July 1995 settlement, but also upon the January 1996 wage increase.
The Board pointed to the January 1996 wage increase to reject Overnite’s argument that a Gissel order was unnecessary because it had corrected its practices after the July 1995 settlement. Id. at 3. In response to Overnite’s two other arguments for why a Gissel order was inappropriate — that significant time had elapsed and that substantial employee turnover had occurred — the Board stated that the facts of time passage and employee turnover were irrelevant. Rejecting the employee-turnover argument, the Board stated:
The Board traditionally does not consider turnover among bargaining unit em *428 ployees in determining whether a bargaining order is appropriate, but rather assesses the situation at the time the unfair labor practices were committed.
* H:
In the present case, even accepting, ar-guendo, the facts asserted by [Overnite] concerning employee turnover, we find the effects of [Overnite’s] unlawful conduct are not likely to be sufficiently dissipated by turnover to ensure a free second election.
As the Fifth Circuit has recognized, “Practices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed.”
Id. at 5 (quoting Bandag, Inc. v. NLRB, 583 F.2d 765, 772 (5th Cir.1978)). Accordingly, the Board ordered Overnite to cease and desist from implementing the January 1996 wage increase and directing it to bargain with the Teamsters at the four locations at issue.
On appeal, a divided panel of this court affirmed the Board, granting its cross-application for enforcement and denying Ov-ernite’s petition for review. Overnite Transp. Co. v. NLRB, 240 F.3d 325 (4th Cir.2001). The panel held that the Board’s findings of unfair labor practices were supported by substantial evidence and that the Board acted properly in bypassing new elections in favor of Gissel bargaining orders. Pursuant to a request for a poll, the court voted to rehear this case en banc and, in ordering a rehearing en banc, vacated the panel decision.
II
In support of its conclusion that Over-nite committed unfair labor practices, the Board found (1) that the March 1995 wage increase was coercive and discriminatory, in violation of § 8(a)(1) and (3) of the Act; (2) that other unfair labor practices, although settled in July 1995, nonetheless provided evidence of illegal conduct at the four sites in question to support Gissel orders; and (3) that the January 1996 wage increase was coercive and discriminatory, in violation of §§ 8(a)(1) and 8(a)(3) and involved direct negotiations with represented employees, in violation of §§ 8(a)(1) and 8(a)(5) of the Act. The Board also found that certain attorney questioning of Overnite employees at the Louisville service center was coercive, in violation of § 8(a)(1) of the Act. Overnite challenges these findings, contending that they are not supported by substantial evidence.
It is now well settled that Board findings of fact are conclusive as long as they are “supported by substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While “[t]he Board may not base its inference on pure speculation ... it may draw reasonable inferences from the evidence.” Owens-Coming Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1362 (4th Cir.1969). Even though we might reach a different result after hearing the evidence in the first instance, we defer to the Board’s findings of fact that are supported by substantial evidence. NLRB v. Daniel Constr. Co., 731 F.2d 191, 193 (4th Cir.1984).
Under this standard, we conclude that substantial evidence supports the Board’s findings with respect to the March 1995 wage increase and the localized unfair labor practices at the four locations considered in this case. We further conclude, however, that the Board’s unfair labor practice findings with respect to either the *429 January 1996 wage increase or the attorney questioning of Overnite’s employees at Louisville are not supported by substantial evidence. We address these conclusions seriatim.
A
Both the timing and the context surrounding the March 1995 wage increase support the Board’s inference that the increase was intended to influence upcoming union elections and to discriminate against those favoring the union. With regard to timing, a red flag is raised by the fact that this wage increase was in addition to the normal wage increase that the company had implemented over the years in either October or January. Overnite had already granted its usual wage increase in January 1995, and it announced the March 1995 increase as a supplement.
In addition, the 1995 wage increase was granted at a time that was close to elections at several service centers. Elections were scheduled in late February (soon after the announcement of the March 1995 wage increase) at three service centers. They were scheduled in March (when the raises would begin to appear on paychecks) at 19 service centers. Also, at the time of the announcement, election petitions had been filed at five other service centers. The timing of a wage increase alone might have been sufficient to support the Board’s finding of an unfair labor practice. See NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964) (noting the “danger inherent in well-timed increases in benefits”); J.P. Stevens & Co. v. NLRB, 461 F.2d 490, 492 (4th Cir.1972) (inquiring whether substantial evidence supported a finding that a benefit announcement was timed to “give[ ] [employees] cause to infer that the benefit might be withdrawn or future benefits withheld should they select a union to represent them”).
In addition to the timing of the March 1995 wage increase, the context in which it was granted supports the Board’s inference of an intent to influence elections. The Board set forth a laundry list of circumstances from which the employees could infer that “the source of benefits ... conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.” Overnite Transp., 329 N.L.R.B. at 3 (quoting Exchange Parts, 375 U.S. at 409, 84 S.Ct. 457). The wage increase was announced prominently in The Ovemiter with a bold-type message that union employees were not eligible for the increase. Overnite also advised employees that it would not be able to grant the wage increase to represented employees. Moreover, the March 1995 wage increase was given in conjunction with the “Give Jim a Chance” campaign and Douglas’s visits to service centers to solicit employee grievances. It followed letters from Douglas to employees, asserting that the union was a threat to Overnite and referencing the Chicago bargaining experience. These efforts were made against the backdrop of Over-nite’s employee handbook which stated “that this Company values union-free working conditions.” Thus, in addition to timing, we conclude that the context of the March 1995 wage increase supports the Board’s finding. See Owens-Corning, 407 F.2d at 1362 (noting that, while timing is a factor, “the thrust of Exchange Parts is the condemnation of granting such benefits with the purpose of affecting the outcome of an election”).
Overnite attempted to respond to the General Counsel’s evidence with evidence that it was pursuing “a proper business purpose.” See J.P. Stevens & Co., 461 F.2d at 493. We conclude, however, that *430 in the context of a national campaign accompanied by numerous company actions—some legal and some not—it remained within the Board’s prerogative to make the factual findings that it made, and substantial evidence in the record supports those findings. “[I]t is not our province, where substantial evidence supports the conclusion of the Board, to substitute our own judgment for that of the Board.” Owens-Coming, 407 F.2d at 1360-61.
B
There is also substantial evidence in the record to support the Board’s finding of § 8(a)(1) violations at Overnite’s service centers in Bridgeton, Norfolk, Louisville, and Lawrenceville. At these locations, Overnite led a “carrot and stick” campaign, promising improvements while warning that hard times were sure to follow if the Teamsters were elected.
At all four centers, Overnite solicited grievances from employees and implied that changes were imminent. As with the March 1995 wage increase, the circumstances surrounding this sudden generosity suggested a “fist inside the velvet glove.” Exchange Parts, 375 U.S. at 409, 84 S.Ct. 457. Management at all four service centers prohibited the posting of pro-union fliers in the break rooms. Bridgeton supervisors took further measures to interfere with pro-union employees’ ability to communicate with other employees. Moreover, by reminding employees of the Chicago experience and threatening to play hard ball when negotiating with any union, Overnite implied that collective bargaining would be futile. In addition to these violations at all four service centers, the supervisors at Louisville and Lawrenceville warned that Over-nite could go out of business if the union were elected. While the supervisors never threatened plant closure, it was not erroneous for the Board to conclude that the warnings were intended to influence the upcoming election.
In addition to carrying out the carrot- and-stick campaigns, the supervisors at Lawrenceville, Louisville, and Norfolk were candid in expressing disdain for pro-union employees. In Louisville, a pro-union employee was told that he had “an attitude problem.” In Norfolk, pro-union employees were referred to as “agitators” and were warned to be careful of retaliation if the union lost. While these comments may not have been explicit threats of retaliation, they provide support for the Board’s conclusion that Overnite intended to influence the outcome of the elections.
C
Unlike the findings about the March 1995 wage increase and the localized conduct, the findings that the January 1996 wage increase constituted an unfair labor practice are not supported by substantial evidence. The 1996 wage increase was granted at a different time and in a different context than the 1995 wage increase. Whereas the 1995 wage increase was granted in the face of over 20 pending elections, the 1996 wage increase was made when few elections were pending and after a major settlement had occurred. Moreover, while the 1995 wage increase was granted in March as the second wage increase of the year, the 1996 wage increase was granted in January, at what had become the “usual time” for Overnite’s annual wage increase.
Moreover, the 1996 wage increase was not featured in The Ovemiter with warnings that it would be unavailable to union employees, and it was not coupled with warnings that bargaining would be futile. To the contrary, Overnite offered the represented employees exactly what it granted the unrepresented employees. As had *431 been Overnite’s practice, the offer for a wage increase included conditions; there were performance requirements that made it possible for Overnite to justify the wage increase even though it had suffered losses the previous year, The Teamsters simply rejected the offer because it thought that the union was entitled to a better deal.
Thus, neither the timing nor the context of the 1996 wage increase supports the conclusion that the offer was coercive and therefore in violation of § 8(a)(1) of the Act.
The record similarly does not support the Board’s conclusion that, in offering the 1996 wage increase, Overnite discriminated against the union, in violation of § 8(a)(3). While § 8(a)(3) makes it unlawful to discourage union membership by discrimination “in regard to ... any term or condition of employment,” 29 U.S.C. § 158(a)(3), there is no duty to grant to union employees every benefit that is granted to non-union employees. Phelps Dodge Mining Co. v. NLRB, 22 F.3d 1493, 1500 (10th Cir.1994); Chevron Oil Co. v. NLRB, 442 F.2d 1067, 1074 (5th Cir.1971). Indeed, because the employer is prohibited from granting unilateral wage increases to represented employees, see 29 U.S.C. § 158(a)(5), when the employer unilaterally grants a wage increase to non-union employees, it must treat union employees differently. Before granting the wage increase to union employees, an agreement must be reached with union representatives.
As wage increases cannot be granted to union employees until there is negotiation, the key issue in determining whether there was discrimination is whether the union employees were foreclosed from the opportunity to receive the wage increase through negotiation. Accord Kezi, Inc., 300 N.L.R.B. 594, 601 (1990).
Because the record clearly shows that the union employees were not foreclosed from receiving the 1996 wage increase, a § 8(a)(3) violation cannot be established. Overnite offered the Teamsters the same package that it granted to non-union employees, and the union was given the opportunity to accept it. The Teamsters simply rejected the offer, asserting that union employees were entitled to the wage increase as an established past practice and that only the productivity responsibilities accompanying the wage increase were subject to negotiation. In essence, the union asserted that, unlike the non-union employees, represented employees were entitled to the increase without the productivity responsibilities. The fact that Overnite refused to accept this counteroffer cannot form the basis for a § 8(a)(3) violation.
The Board has tried to avoid the necessary disparate treatment of non-union and union employees by adopting the Teamsters’ position that the wage increase was not, in fact, a change over prior years. By characterizing the wage increase as part of the established compensation system, the Board avoided the problem that its position would have required Overnite unilaterally to grant a wage increase. Instead, the Board asserted that Overnite unilaterally took away the wage increase. But this assertion is inconsistent with the nature of Overnite’s practices with regard to wage increases.
The standard for whether a practice has become part of the established wage or compensation system is whether it would be clearly apparent to an objectively reasonable employer that the “grant or denial of a benefit, at the time the action is taken, conforms to the status quo.” Southern Maryland Hosp. Ctr. v. NLRB, 801 F.2d 666, 669 (4th Cir.1986) (requiring a finding that Christmas bonuses were giv *432 en over a significant period of time before they could be treated as status quo). Compensation practices such as bonuses are not considered a “term[ ] and condition ] of employment” unless “they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation.” Phelps Dodge Mining, 22 F.3d at 1496 (citations and internal quotation marks omitted).
While there is substantial evidence in this case to support the conclusion that annual wage increases were paid over a significant length of time, the nature of the wage increases was not sufficiently fixed to become a “term or condition of employment.” Where wage increases are tied to unpredictable and discretionary factors, such as profitability, and the amounts do not follow a discernable pattern, they are not of “a fixed nature.” Phelps Dodge Mining, 22 F.3d at 1496. For example, it has been held that eight payments to various employees over four years, where the payments were of varying amounts at varying time intervals, and where there were complaints about their unpredictability, did not amount to substantial evidence that the payments were fixed. Id. at 1497.
To the extent that a wage increase was expected, Overnite’s practice followed a pattern that the nature of the wage increase was dictated by profitability, the only constant being that each year’s wage increase was different. For example, Ov-ernite’s profitability was so low in 1991 that no wage increase could be granted that year. And beginning in 1992, because of profitability concerns, the wage increase was granted in January instead of October. In addition, profitability affected Over-nite’s packaging of the wage increase. For example, the 1994 wage increase was granted as part of the Performance Incentive Plan. The 1996 wage increase simply repeated this model. Because of profitability concerns, Overnite proposed to include performance obligations with the wage increase. While this quid pro quo was initiated unilaterally with regard to non-union employees, Overnite followed its § 8(a)(5) duty to bargain collectively with the Teamsters before initiating the proposal with respect to employees represented by the Teamsters.
If the Teamsters had accepted that offer, union employees would have received the same wage increase that non-union employees received. The Teamsters, however, rejected the offer, requesting instead the wage increase without the attendant performance obligations. By separating the wage increase from facilitating conditions, the Teamsters created an illusion, which the Board accepted, that something was being taken away. To agree with this conclusion, however, would require us to hold that, simply by organizing, union employees became entitled to a better deal than non-union employees. Because such a holding would unconscionably mischarac-terize the nature of profitability-related wage increases, we cannot conclude that Overnite’s practices violated § 8(a)(3) of the Act.
Finally, the record lacks substantial evidence to support a § 8(a)(5) violation. Section 8(a)(5) prohibits an employer from bypassing the union to bargain directly with employees. 29 U.S.C. § 158(a)(5); Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Holly Farms Corp. v. NLRB, 48 F.3d 1360, 1368 (4th Cir.1995). However, an employer is allowed to talk with employees and to communicate its position to them. Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB, 164 F.3d 867 (4th Cir.1999). The limit of these communications is offering a quid pro quo that is not before the union. Id.
*433 The employer’s § 8(a)(5)-duty is to present proposals to the union before communicating them to employees. See Ameri-care, 164 F.Sd at 876-77 (holding that an employer could only distribute its proposal to union employees when the proposal was “properly before” the union). There is, however, no “rule requiring employers to delay informing [their] employees of a proposal until the union has some period of time to consider it. Communications to employees that inform them of their employer’s bargaining position constitute no violation.” Id. (citation omitted). Publicizing the offer that is before the union does not erode the union’s position as the bargaining representative because as long as the presentation is not coercive, such publication is a reasonable dissemination of information “that aids employees in making informed decisions and promotes a stable bargaining environment.” Id.
In this case, Overnite informed the Teamsters of its proposed productivity plan before informing the representative employees of the plan. The plan was sent to union representatives on December 11, 1995, by overnight mail. When Overnite presented the plan to its representative employees on December 13, it was merely exercising its right to publicize its bargaining position. The record does not suggest that the proposal was coercive in any way. To the contrary, represented employees were told that Overnite was negotiating over the increase with the union and that they should refer feedback and questions to their union representatives. Those negotiations were scheduled to begin around December 17,1995.
Because we conclude that substantial evidence does not support a finding that the 1996 wage increase amounted to an unfair labor practice, we refuse to enforce the Board’s order insofar as it redresses that wage increase.
D
Finally, Overnite challenges the Board’s finding that certain questions asked by Overnite’s attorneys to employees at Overnite’s Louisville service center violated § 8(a)(1) of the Act.
In preparation for the hearing before the ALJ, Overnite’s attorneys distributed an eight-page questionnaire to Overnite’s employees at the Louisville service center. The ALJ concluded that the following four questions were coercive, in violation of § 8(a)(1):
(1) If you didn’t sign the card or petition the first time you were asked, why did you sign it when you were asked to do so again?
(2) Who did you give the card or petition to after you signed it?
(3) Did anyone from the Union tell you it was important for you to report to the Union or any employee any problems you had with the Company since the Union needed unfair labor practice charges to help them overturn the election? If yes, who?
(4) Have you given a statement to anyone else regarding the election or the Company’s or the Union’s conduct?
On review, the Board found that the first and third questions were unlawfully coercive and declined to pass on the other two.
In considering whether posing such questions to employees was coercive, we note that employers may ask their employees about their sentiments regarding the union. But the questions may become coercive if they have “a reasonable tendency in the totality of the circumstances to intimidate.” Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1137 (4th Cir.1982) (internal quotation marks and citations omitted). *434 “The gravamen of the violation is intimidation tending to discourage union activities.” NLRB v. P.B. & S. Chem. Company, 567 F.2d 1263, 1267 (4th Cir.1977).
To determine whether employers’ questions put to employees are coercive, we consider whether the employer followed specific safeguards. First, “the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; [second,] the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature; and [third,] the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee’s subjective state of mind, or otherwise interfering with the statutory rights of employees.” Standard-Coosa-Thatcher, 691 F.2d at 1140 n. 8 (quoting Johnnie’s Poultry Co., 146 N.L.R.B. 770, 775 (1964)).
With respect to the first question at issue, the ALJ found that the employer was improperly inquiring into the employee’s subjective reasoning. While this inference is possible, it is likely that the question actually sought information about the union’s activities, and not merely the employee’s subjective state of mind. Because of this ambiguity, the ALJ should have considered the other safeguards before reaching its conclusion that the question was coercive.
With respect to the second, third, and fourth questions, the ALJ found that they exceeded Overnite’s legitimate purposes. We do not agree. Overnite had the right to determine the context of union recruitment, and its questions were geared toward determining what organizers did to encourage employees to sign cards. Even if we agree that the questions might be construed as overly broad, the ambiguity precluded the ALJ from reaching the conclusion that the questions were in fact coercive without considering the other safeguards.
Accordingly, with respect to the Board’s findings on the questions posed by Over-nite’s attorneys, we remand for further consideration by the Board should the Board find it necessary and appropriate to consider them in the light of our other rulings.
Ill
This brings us to the principal argument raised by Overnite in its petition for review—whether the Board abused its discretion in bypassing the traditional remedy of ordering new elections by ordering Ov-ernite to bargain with the Teamsters at the four locations at Bridgeton, Norfolk, Louisville, and Lawrenceville. The Board concluded that fair elections could not be conducted because the unfair labor practices were so severe and were carried out by such high ranking officers of Overnite that its employees would remember the practices.
Overnite advances four reasons why the Board’s conclusion is unsupportable. First, it points out that it settled most of the unfair labor practices in July 1995 and took “extraordinary steps to avoid future unfair labor practices.” Second, it notes that turnover at the four sites was extensive, ranging, as of early 1999, from 29% to 40% of the employees. Third, it points out that Overnite’s management, which was involved in the unfair labor practices, had all left their positions. And fourth, it asserts that the four-to-five-year lapse of time since the unfair labor practices occurred dissipated their harmful effect. In sum, Overnite argues that changes in circumstances following the unfair labor prac *435 tices left little reason to conclude that fair and accurate reelections could not take place.
In response, the Board pointed to the 1996 wage increase as evidence of continuing unfair labor practices by Overnite following the July 1995 settlement. As we have now found the Board’s position on that issue unsupported, it cannot support the bargaining orders. The Board also posited that employee turnover is not a fact that is considered under Board precedent. But even when turnover is considered, the Board concluded that the lore of the shop carries on the adverse effect of past unfair labor practices. Finally, the Board declared that it generally does not consider the passage of time to be relevant. Rather, it considers unfair labor practices and the remedies for them at the time they were committed—in this case in late 1994 and early 1995. In any event, the Board concluded summarily that the passage of four to five years after the unfair labor practices was not sufficiently long to conclude that Gissel orders were unwarranted.
The background facts of the changed circumstances in this case are not disputed. At the four relevant service centers, the union obtained signed card majorities before the elections from 27 employees at Bridgeton (from a unit of 49); 62 at Norfolk (from a unit of 91); 117 at Louisville (from a unit of 174); and 45 at Lawrence-ville (from a unit of 86). At each location the union lost the election, mostly by a small margin.
Following the elections at these and other sites, the Teamsters complained of unfair labor practices, and the General Counsel filed more than 20 complaints. Most of the complaints were settled on July 29, 1995. And except for the 1996 wage increase, which we have over-turned as an unfair labor practice, there was virtually no evidence of unfair labor practices committed after the settlement.[2] The settlement did leave open for adjudication the Teamsters’ request for Gissel orders at Bridgeton, Norfolk, Louisville, and Law-renceville, and with respect to these four locations, the ALJ issued his findings of fact and recommendations for the issuance of Gissel orders on April 10, 1998, and the Board issued the Gissel orders on November 10,1999.
In the interim, employee turnover was concededly significant. As of early 1999, there had been a 40% employee turnover at Bridgeton; 32% at Norfolk; 29% at Louisville; and 36% at Lawrenceville. In addition, virtually all of the Overnite management involved in the unfair labor practices had left or been replaced. Douglas, Overnite’s president, left in February 1997; Edwards, one of the persons to whom threats about the Chicago experience were attributed, left in December 1995; and the managers of all four service centers had left at various times.
In the context of this evidence, we must determine whether fair reelections could have been conducted five years later under appropriate supervision by the Board, or, stated in the language of Gissel, whether the “coercive effects” of the unfair labor practices had been eliminated so that a “fair and reliable election” could be held. Gissel, 395 U.S. at 614, 89 S.Ct. 1918.
The applicable Gissel principles have been repeatedly articulated in this circuit. First, we have noted that it is the *436 strong preference of our national labor policy not to impose collective bargaining representatives on employees except when they have, by a majority vote, elected to be so represented. See NLRB v. Apple Tree Chevrolet, Inc., 671 F.2d 838, 840 (4th Cir.1982) (“Apple Tree II”). Because “an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employees,” NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 996 (4th Cir.1979) (“Appletree I"), “the extraordinary and drastic remedy of forced bargaining pursuant to [Gissel ] is reserved for only the most unusual cases.” Be-Lo Stores v. NLRB, 126 F.3d 268, 273 (4th Cir.1997) (internal quotation marks and citations omitted). Gissel orders are available only when traditional remedies are insufficient to make possible a “fair and reliable election.” Gissel, 395 U.S. at 614, 89 S.Ct. 1918. Second, when imposing Gissel orders, we require “specific” and “detailed” findings. Apple Tree II, 671 F.2d at 840.
To satisfy the requirements for imposing a Category II type of Gissel order — the type involved in this case[3]— the Board must make detailed findings specifically supporting the facts that (1) the union enjoyed a preelection majority in the relevant unit; (2) the employer committed an unfair labor practice; (3) the unfair labor practice caused the union’s majority status to be dissipated; (4) the possibility of conducting a fair reelection would be slight; and (5) the employees’ preelection sentiments would be better protected by a bargaining order than by a new election. In turn, to find that the possibility of conducting a fair election would be slight and that employees’ previ-olation sentiments would be better protected by a bargaining order, the Board must specifically consider and make findings about (a) the likelihood of recurring misconduct; (b) the residual impact of unfair labor practices, considering whether that effect has been or will be dissipated by the passage of time; and (c) the efficacy of ordinary remedies. See generally Gissel, 395 U.S. at 613-14, 89 S.Ct. 1918; Be-Lo, 126 F.3d at 282; Appletree I, 608 F.2d at 996-97.
In this case, the Board properly considered the union’s preelection majority status, the employer’s unfair labor practices, and the causal relationship between those practices and the dissipation of the union’s majority. The Board failed, however, to direct us to evidence that a new fair election could not be conducted in the circumstances presented.
While the Board purported to address the prospects for a new election, it spoke only in a conclusory manner, without directing the court to any factually based reason why new elections could not be fair in this case. The Board stated in a conclu-sory fashion, “that the holding of fair elections in the future would be unlikely and that the employees’ wishes are better gauged by old card majority than by new election.” Ovemite Transp., 329 N.L.R.B. at 3 (internal quotations and alterations omitted). While the Board did examine the likelihood of reoccurrence of the unfair *437 labor practices, its assessment rested almost entirely on its conclusion that the January 1996 wage increase violated § 8(a) of the Act. But we have already concluded that the January 1996 wage increase did not violate the Act. And there was no other indication that the unfair labor practices settled in July 1995 would reoccur.
Moreover, other factors, which would suggest that a fair election could be held, were improperly ignored by the Board as irrelevant. The Board indicated that it generally does not evaluate the passage of time between the unfair labor practices and the issuance of an order to be relevant. More importantly, the Board has stated that it does not consider employee turnover that might occur during any such passage of time:
The Board traditionally does not consider turnover among bargaining unit employees in determining whether a bargaining order is appropriate, but rather assesses a situation at the time the unfair labor practices were committed.
If the unfair labor practices are severe, the Board relies on the “lore of the shop” to conclude that past practices continue to repress employee sentiment despite turnover.
By so limiting its consideration of the events following the unfair labor practices, the Board cannot make the necessary detailed findings about the possibility of conducting a fair election years after the unfair labor practices occurred. Moreover, and perhaps more importantly, in taking this position, the Board refuses to follow the clear and established precedent of this Circuit that both the passage of time and employee turnover are highly relevant matters to be considered.
On the passage of time we have stated: It strains credulity to believe that [a company’s] unfair labor practices, such as they were, had such long lasting effects that a fair rerun election could not have been held four years later, much less today, some six years after the original violations occurred.
Be-Lo, 126 F.3d at 282. We have found that even more telling than the passage of time is the turnover of employees: “ ‘Significant employee turnover through normal attrition’ is highly relevant to determining the necessity of a bargaining order and well ‘may make a bargaining order inappropriate.’ ” Id. (quoting NLRB v. So-Lo Foods, 985 F.2d 123, 128-29 (4th Cir.1992)). As we explained:
Not only is the possibility of a fair rerun election great when many of the intimidated employees have moved on and been replaced by new workers who have not witnessed the company’s unfair labor practices, but the issuance of a bargaining order in the face of significant employee turnover risks unjustly binding new employees to the choices made by former ones.
Be-Lo, 126 F.3d at 282-83 (internal quotation marks and citations omitted).[4]
*438 The evidence in the record here indicates a substantial passage of time and employee turnover. At the four locations at issue, the turnover, as of early 1999, was anywhere from 29% to 40%. In addition, most of the executives involved in the unfair labor practices had left. The period of time elapsing between the unfair labor practices and the Board’s order was almost five years and by now would be over six years. Moreover, the unfair labor practices which were supported by substantial evidence were settled in July 1995. After the settlement, Overnite took steps to avoid future unfair labor practices, which the record indicates were effective.
It is also telling that fair reelections were found to have been conducted at several other sites which were similarly influenced by Overnite’s unfair labor practices. For instance, at Memphis, Toledo, and Moonachie, where the same national and local unfair labor practices occurred, the General Counsel and the Teamsters withdrew their request for Gissel orders and proceeded with new elections. The Teamsters won the elections at Toledo and Memphis and lost the election at Moona-chie. All of those elections were certified as free and fair.[5]
In sum, the Board did not and could not, on the evidence in the record, fulfill the requirements for the scrupulous specificity demanded by our precedents for imposing Gissel orders. Indeed, if its analysis had been complete, it would have had to come to terms with the fact that a fair election rerun was available at each of the four locations in question. The approval of such orders without satisfying ourselves that new elections could not remedy the unfair labor practices found by the Board would undermine labor law’s fundamental policy of democratic representation. For these reasons, we refuse to enforce the Gissel orders at these locations.
IV
In sum, we conclude that the Board’s findings that Overnite committed unfair labor practices in implementing its March 1995 wage increase and in conducting its election campaigns at Bridgeton, Norfolk, Louisville, and Lawrenceville were supported by substantial evidence. We conclude that the Board’s finding that Over-nite committed unfair labor practices in implementing its January 1996 wage increase was not supported by substantial evidence. And we remand the findings with respect to the attorney questions posed to employees at the Louisville service center for further proceedings.
In addition, we conclude that the requirements for imposing Gissel orders at the four locations were not found and could not be found on this record. Therefore, we refuse to enforce any Gissel orders at Bridgeton, Norfolk, Louisville, and Lawrenceville.
Accordingly, we grant in part and deny in part Overnite’s petition for review; we deny the Board’s cross-application for enforcement insofar as it is inconsistent with this opinion; and we remand for new elections at the four sites and for entry of such other order as is appropriate but not inconsistent with this opinion.

IT IS SO ORDERED.

. Elections were scheduled at Bensalem, Pennsylvania (2/2/95); Cornwell Heights, Pennsylvania (2/14/95); Bridgeton, Missouri (2/28/95); Milwaukee, Wisconsin (3/6/95); Appleton, Wisconsin (3/6/95); Grand Rapids, Michigan (3/7/95); Detroit, Michigan (3/15/95); Lexington, Kentucky (3/15/95); London, Kentucky (3/16/95); South Bend, Indiana (3/16/95); Louisville, Kentucky (3/17/95); Charleston, West Virginia (3/20/95); Parkersburg, West Virginia (3/21/95); Pennsauken, New Jersey (3/23/95); Toledo, Ohio (3/24/95); Elmsford, New York (3/24/95); Cincinnati, Ohio (3/28/95); Rockford, Illinois (3/28/95); Nashville, Tennessee (3/29/95); Dayton, Ohio (3/30/95); Parsippa-ny, New Jersey (3/31/95); and Norfolk, Virginia (3/31/95). Also, election petitions had been filed in Lafayette, Indiana; Fort Wayne, Indiana; Bowling Green, Kentucky; Moona-chie, New Jersey; and Bayshore, New York.

. The Board also found that lawyers' questioning of employees in preparation of Over-nite’s defense in Louisville committed unfair labor practices in posing coercive questions to the employees. But we have concluded that these allegations also were unsupported by the record.

. The Supreme Court has recognized a Category I type of case that it characterized as an "exceptional” case, in which bargaining orders may be imposed without inquiry into a union’s preelection majority status. This Category I case is "marked by outrageous’ and pervasive’ unfair labor practices,” where the coercive nature of the illegal practices “cannot be eliminated by the application of traditional remedies.” Gissel, 395 U.S. at 613-14, 89 S.Ct. 1918. The presumptive impossibility of having a "fair and reliable” election is the essence of this Category I type of case, which neither the Board nor the parties assert is the situation presented in this case.

. The Board concluded that even though a "significant number of employees” had left Overnite’s employ since the unfair labor practices, the practices nevertheless "live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed.” Overnite Transp., 329 N.L.R.B. at 5 (quoting Bandag, Inc. v. NLRB, 583 F.2d 765, 772 (5th Cir.1978)). But we have rejected this reasoning as speculative. "Absent substantial evi-dentiary support that the effects of unlawful practices have in fact continued to be felt in the workplace, we believe that such inferences as to the likely effect of 'lore of the shop' have no place in the calculus of whether a mandatory bargaining order is warranted.” Be-Lo, 126 F.3d at 283. We have noted that this type of speculation "evisceratefs] one of the most important of the heightened requirements for a Gissel category II mandatory bargaining order.” Id.

. In Cincinnati, where the General Counsel reserved the right to seek a Gissel order, the Teamsters agreed to proceed to a new election, which it lost. After the Teamsters objected to that election based on the January 1996 productivity package, a third election was conducted which the Teamsters won. That election too was certified by the Board.